UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO. 3:24-CR-00151 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| MATTHEW ISAAC KNOOT | ) | |

## COMPANY A'S MOTION AND MEMORANDUM OF LAW
## TO REMAIN FULLY ANONYMOUS AT TRIAL

Comes now Company A,[1] by and through undersigned counsel, and moves for the sole, limited purpose[2] of asserting its rights under the Crime Victims Rights Act, 18 U.S.C. § 3771 ("CVRA,"). Company A objects to certain aspects of the trial procedure proposed in a recent stipulation ("Stipulation," Dkt. 82-1) between the United States and defendant Matthew Isaac Knoot ("Knoot"). Anonymity is crucial for Company A and its witnesses in this case based on concerns that it will be targeted by the Democratic People's Republic of Korea ("North Korea") for further attacks on its computer systems. Company A therefore respectfully objects to providing the jury with names, testimony, exhibits, or other information that would allow them to identify Company A or its representatives. The United States takes no position on the relief requested in this motion, while Knoot is opposed. In support, Company A would show the following:

## BACKGROUND

As the Court is aware, this case began with an investigation conducted by the Federal Bureau of Investigation ("FBI") into Knoot's involvement in a North Korean scheme to embed IT

---

[1] Company A is identified in the Indictment. Dkt. 3, ¶ 10.a. Company A refers to itself pseudonymously in light of the relief requested herein.

[2] Apart from protecting its anonymity, Company A has no other interest in this case, which it leaves to the parties and the Court to litigate and decide.

workers in American businesses. *See* Dkt. 3, ¶¶ 15-30. Company A conducted an internal investigation into a remote IT worker whose company-issued laptop began connecting to suspicious foreign internet addresses through software that Company A did not install or approve for its employees' use. Dkt. 75, at 1-2; Dkt. 3, ¶¶ 16-17. Company A discovered that one or more North Korean IT worker(s) using the stolen identity of a U.S. citizen, Andrew M., had been hired through a staffing agency for remote work. *See* Dkt. 3, ¶¶ 6-7. Knoot received and hosted a remote laptop belonging to Company A in the United States and installed applications that allowed the North Korean IT worker(s) to access it from overseas while deceiving Company A into believing that the IT worker it believed it had hired was located in the United States. *Id.* ¶ 9.

The North Korean IT worker(s) thereby fraudulently obtained remote IT work and gained access to some of Company A's computer systems between August 2022 and March 2023. But once Company A began its investigation into Knoot's and the North Korean IT worker(s)' suspicious computer use, the North Korean IT worker(s) masquerading as Andrew M. resigned. Following that resignation, Company A carefully audited all the work done during Andrew M.'s supposed employment and reviewed the information and systems the North Korean IT worker(s) were able to access. Dkt. 3, ¶ 17(o). But Company A cannot delete the knowledge the North Korean IT worker(s) gained through Knoot's facilitation of access to Company A's systems.

Company A's report to the FBI and its support of the FBI's subsequent investigation helped lead to a grand jury indictment against Knoot in 2024. Dkt. 75, at 2-3; *see generally* Dkt. 3. In anticipation of trial, the United States sought to protect Company A's identity by allowing Company A's representatives to testify at trial pseudonymously, to refer to Company A pseudonymously, and to prohibit cross-examination into details that would reveal Company A's identity. *See generally* Dkt. 75. Shortly after the United States filed its motion, Knoot and the

United States agreed to allow Company A and its representatives to testify pseudonymously but to also distribute a "key" to the Court, to Knoot, and to the jury that would identify Company A and its representatives by their real, full names.  Dkt. 82-1, ¶¶ 1-2, 5-6.

Company A now moves to amend that trial process to prevent the jury from receiving a "key" or any other information that would allow it to identify Company A or its representatives.

## ARGUMENT

Criminal defendants maintain rights to confront their accusers, but those protections are not abridged by allowing Company A to remain anonymous throughout trial.  As the parties and the court have already agreed, the charges against Knoot can be tried without ***any*** testimony disclosing the identity of Company A or its representatives, since neither Company A nor any of the other "Victim Companies" will ever be identified in trial testimony.  Dkt. 82-1, ¶¶ 1-2, 4; Dkt. 84.  Knoot himself (and the court) will be able to identify each witness and the victims they represent through a "key indicating the witnesses' true name[s] and affiliation[s], along with their respective pseudonym[s]."   Dkt. 82-1, ¶ 5.  The Court has already accepted this procedure, Dkt. 84, and Company A does not object to this much of it.

But Company A ***does*** object to distributing a copy of the "same key" or any other identifying information ***to the jury***.  *Cf.* Dkt. 82-1, ¶ 6.  That procedure will undo the protections served by pseudonymous testimony, since it will allow the jury to connect each witness and victim—including Company A and its representatives—to their public identities.  And while jurors might be expected to maintain confidentiality during trial, nothing will prevent them from disclosing Company A's identity or those of its representative witnesses afterward.  Should they do so, Company A will face the same risk of reprisal from North Korea that it would face if forced to testify openly.  Moreover, exposing Company A's victimization by the North Korean scheme

3

Knoot facilitated here might embolden other foreign actors to attempt a similar scheme in the future.[3]

Put simply, disclosing Company A's identity to the jury would serve no purpose for Knoot's defense but would subject Company A to a substantial risk of further attacks from North Korea. Accordingly, and as explained in more detail below, Company A respectfully requests that the Court follow the procedure outlined by the parties but without providing the jury with the same key that Knoot himself will receive.[4] Company A further requests that the Court protect its identity during jury selection and redact its name, identifying information, and the last names and identifying information of its any of its personnel from any materials admitted as evidence or presented to the jury.

**I.  COMPANY A MAY ASSERT ITS RIGHTS UNDER THE CRIME VICTIMS RIGHTS ACT.**

As an initial matter, Company A is a crime victim and may therefore assert its privacy rights in this case. Under the CVRA, a victim's rights "shall be asserted in the district court in which a defendant is being prosecuted." 18 U.S.C. § 3771(d)(3); *see also United States v. Kovall*, 857 F.3d 1060, 1065 (9th Cir. 2017) ("The CVRA provides mechanisms for enforcing a victim's rights under the Act. The government, the victim, or the victim's lawful representative may assert the victim's rights in the district court in which the defendant is being prosecuted"). Those rights include the

---

[3]  In light of recent reports that Russia may have gained illicit access to the federal PACER and case management system, even the Court itself may not be immune from hacking attempts. *See* Adam Goldman et al., *Russia Is Suspected to Be Behind Breach of Federal Court Filing System*, New York Times (Aug. 12, 2025), https://www.nytimes.com/2025/08/12/us/politics/russia-hack-federal-court-system.html.

[4]  Company A recognizes that Knoot's own knowledge of its identity is unavoidable and further recognizes that Knoot himself might divulge that information. But any resulting damage to Company A might negatively impact other aspects of his case, such as sentencing, and might support additional civil liability against Knoot. These consequences should deter Knoot from disclosing Company A's identity.

"right to be reasonably protected from the accused" and to be "treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(1), (8); *see also* Order, at 2, *United States v. Koziol*, No. 2:18-cr-22, Dkt. No. 97 (C.D. Cal. May 31, 2018) ("[T]he Court concludes that the victims have standing to contest the [pretrial] discovery order insofar as they assert that the order violates their rights to dignity and privacy as provided under the CVRA.").

The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense…." 18 U.S.C. § 3771(e). Courts have applied that definition liberally to cover any party that "would be considered a 'crime victim' if the government were to establish the truth of the factual allegations in its charging instrument." *United States v. Turner*, 367 F. Supp. 2d 319, 326 (E.D.N.Y. 2005). And courts have treated companies as victims just like individuals. *See, e.g.*, *United States v. Bibikov*, No. 1:18-cr-00258-BLW, 2023 WL 6128190, at *2 (D. Idaho Sept. 19, 2023) (sealing exhibits that disclosed victim companies' information).

Here, there is no question that Company A is a victim of the crimes allegedly committed by Knoot. According to the indictment, Knoot helped the North Korean IT worker(s) access Company A's systems through the use of an identity stolen from "Victim 1," *i.e.*, Andrew M. Dkt. 3, ¶¶ 8-9. The Indictment refers to Company A as one of several "victim companies" damaged by Knoot's alleged scheme. Dkt. 3, ¶¶ 10.a, 11. And the parties' own Stipulation refers to Company A as one of the "Victim Companies." Dkt. 82-1, ¶¶ 1-2. Because it is a victim of Knoot's alleged crimes, Company A is entitled to assert its privacy rights here. 18 U.S.C. § 3771(d)(3).

## II. FULLY PSEUDONYMOUS TESTIMONY WILL PROTECT COMPANY A'S PRIVACY AND WILL NOT OFFEND KNOOT'S RIGHT TO PRESENT HIS DEFENSE.

Company A asserts its right to keep its identity fully undisclosed at trial. Under the Sixth Amendment, a defendant generally has the right to "ask [a] witness who he is and where he lives"

because such questions are often the starting point for cross-examination. *Smith v. State of Illinois*, 390 U.S. 129, 131 (1968). More recently, however, the Supreme Court has held that a district court also has "wide latitude insofar as the Confrontation Clause is concerned" to limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Courts have resolved this tension in favor of anonymous testimony in several circumstances. *E.g., United States v. Ramos-Cruz*, 667 F.3d 487, 492, 500-01 (4th Cir. 2012) (police officers testifying against gang members); *United States v. Raniere*, No. 20-3520-cr, 2022 WL 17544087, at *1, *7 (2d Cir. Dec. 9, 2022) (sex-trafficking and forced-labor victims). Security concerns also support anonymous testimony. *E.g., United States v. Schulte*, 436 F. Supp. 3d 698, 704, 706-07 (S.D.N.Y. 2020) (CIA officers allowed to testify by pseudonym or by first name only); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2018) (undercover agent allowed to testify pseudonymously to "protect" his "safety and ability to continue to work as such"). And while the Sixth Circuit has not developed a significant body of case law, it has allowed anonymous testimony in at least some circumstances. *United States v. Hendricks*, 950 F.3d 348, 355-56 (6th Cir. 2020) (affirming decision allowing undercover FBI agent allowed to testify under a pseudonym and in a "light disguise" in a partially closed courtroom).

In *Raniere*, the Second Circuit identified the two key Sixth-Amendment protections implicated by a witness's true identity: first, the defendant himself needs to know the witness's identity for pre-trial investigation; and second, he may need to explore the witness's identity in front of the jury for the purpose of impeaching the witness's credibility or other similar purposes. 2022 WL 17544087, at *6 (quoting *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970)).

The court then held that these Sixth Amendment concerns did not require exposing the identities of the defendant's alleged victims to the jury for a few reasons: (1) requiring witnesses to provide their names in public could chill their willingness to testify for fear of having their personal histories publicized; (2) the defendant already knew their identities before trial and could therefore investigate them adequately; and (3) the victims' names were not relevant to their testimony or their credibility. *Id.* at *7.

Under these principles, pseudonymous testimony from Company A and its representatives is warranted. **First,** Company A faces reprisal from North Korean actors should its cooperation with this criminal investigation and prosecution be publicly disclosed. North Korea has engaged in increasing cyberattacks in recent years.[5] Company A has previously been targeted by Labyrinth Chollima—a hacking group with ties to the North Korean government[6]—seeking access to its systems and confidential information. Knoot's facilitation of direct access to Company A's systems gave the still-unapprehended North Korean IT worker(s) inside access to some of Company A's systems. That knowledge could give North Korean actors an advantage should they try to access Company A's systems again in the future.

Public disclosure of its role in stopping such schemes in this case would also put a target on Company A. The devastating attack on Sony Pictures Entertainment in 2014 ("Sony") was

---

[5] *E.g.*, *North Korea State-Sponsored Cyber Threat: Advisories*, Dep't of Homeland Sec., Cybersecurity & Infrastructure Sec. Agency, (last visited Aug. 15, 2025), https://www.cisa.gov/topics/cyber-threats-and-advisories/nation-state-cyber-actors/north-korea/publications (offering reports on multiple recent North Korean cyberattacks, including attacks on a wide range of businesses); *2025 CrowdStrike Threat Hunting Report: Adversaries Weaponize and Target AI at Scale*, CrowdStrike (Aug. 4, 2025), https://www.crowdstrike.com/en-us/press-releases/crowdstrike-releases-2025-threat-hunting-report/ (reporting North Korean infiltrations of over 300 companies using AI tools).

[6] *E.g.*, *Global Threat Landscape: Labyrinth Chollima*, CrowdStrike, https://www.crowdstrike.com/adversaries/ (last visited Aug. 15, 2025).

driven by Sony's production of a comedy film depicting an assassination plot against North Korea's head of state, and Sony suffered millions in damages and lost profits, as well as large-scale identity theft and other business disruptions.[7] Even referring to that attack here raises concerns for Company A, since it may inadvertently signal that such retaliation is both feared and effective, which in turn might embolden North Korean actors or similar adversaries to replicate it. But Company A is compelled to raise this example because the current stipulation does not go far enough to shield it from the real and present danger of exposure.

By contrast, the lack of publicity and the protection of Company A's identity to date has enabled Company A to participate in the United States' investigation without fear of retaliation from North Korea, harassment, or other security threats. As a victim of Knoot's alleged facilitation of North Korea's scheme, Company A is uniquely positioned to support the United States' case here. And continued anonymity would reinforce Company A's commitment to cooperating with the United States and supporting this case and others through to its resolution. These are just the kinds of protection and privacy interests that the CVRA covers. 18 U.S.C. § 3371(a)(1), (8). But exposing Company A's identity now would penalize Company A for carrying out its civic duty by opening it to the same kinds of recriminations that Sony experienced merely for producing a film. That North Korean actors now have some *inside* knowledge of Company A's systems makes that threat all the more serious.

---

[7]  *E.g.*, Sam Frizell, *Sony Is Spending $15 Million To Deal With The Big Hack*, Time (Feb. 4, 2015), https://time.com/3695118/sony-hack-the-interview-costs/; *Sony's New Movies Leak Online Following Hack Attack*, NBC Tech News (Nov. 30, 2014), https://www.nbcnews.com/storyline/sony-hack/sonys-new-movies-leak-online-following-hack-attack-n258511 (noting that several of Sony's then-upcoming films were leaked online and downloaded by over 1 million unique users mere weeks after the hack became public); *Update of Sony Investigation*, U.S. Dep't of Justice (Dec. 19, 2014), https://www.justice.gov/archives/opa/pr/update-sony-investigation (noting extensive loss of computers and data, as well as theft of thousands of employee identities from hack; concluding that "the North Korean government [wa]s responsible").

Moreover, public disclosure of Company A's identity could compromise the integrity of the United States' ongoing investigation in this and other similar cases involving foreign actors. Company A played a significant role in Knoot's prosecution by reporting suspicious online activity on Company A's remote laptop. Company A's initial reporting and continued cooperation with the FBI led to the FBI's successful investigation of potential criminal conduct, specifically of Knoot's facilitation of a North Korean revenue-generation scheme. Penalizing Company A through public disclosure now would serve only to damage the FBI's similar investigations in the future. And while the United States may have ultimate control over its law enforcement policies and priorities, the CVRA counsels the Court to *also* consider Company A's experience as a cooperative victim when deciding whether Company A should receive pseudonymous status at trial. Victims in Company A's position are likely to be chilled or discouraged if they know they risk public exposure because of their cooperation in incidents like this one.

If anything, Company A's cooperation with the FBI calls for reward, not punishment, under the U.S. Department of State's Rewards for Justice ("RFJ") program established by the 1984 Act to Combat International Terrorism. *See generally* 22 U.S.C. § 2708. The RFJ offers up to $5 million for information leading to the disruption of financial schemes that support North Korea, including work by North Korean nationals whose income generates funds for the North Korean regime. *See* Rewards for Justice, "North Korean Information Technology (IT) Workers" (last visited Aug. 15, 2025), https://rewardsforjustice.net/rewards/north-korean-information-technology-it-workers/. Through its cooperation in this case, however, Company A is now at risk of being publicly exposed for potential retaliation from North Korea or negative publicity in the United States. Moreover, exposure now would send a message to other companies facing similar

9

victimization that they will not be able to remain anonymous if they report their victimization to the FBI.

**Second,** exposing Company A to the jurors would not benefit Knoot's investigation of Company A. Knoot is already aware of Company A's identity, and the United States has represented its continued compliance with its disclosure obligations. Dkt. 75, at 7. Knoot therefore has had as much opportunity as any criminal defendant to investigate Company A to prepare for trial and cross-examination.

**Third,** neither Company A's identity nor the identities of any of its representatives are germane to the charges against Knoot. Company A could be just about any domestic employer with an IT department and the facts it is likely to present at trial would not change. And Knoot himself has already agreed not to elicit any trial testimony that would tend to identify Company A, which confirms that Company A's identity is irrelevant to any cross-examination he is entitled to conduct under the Sixth Amendment.

Company A has no objection to Knoot himself receiving a "key" to ensure he is able to identify each representative witness at trial for the purpose of cross-examination, as the parties' Stipulation provides. Just like any other defendant, Knoot will be able to cross-examine Company A's representatives about any topic that is relevant to his defense. Dkt. 82-1, ¶ 5. Knoot therefore "will not be deprived of his right to confront [Company A's representatives] and cross-examine them," since their true identities are "immaterial to [Knoot's] guilt or innocence." *United States v. Naseer*, No. 10 CR 19 (S-4) (RJD), 2015 WL 13843166, at *3 (E.D.N.Y. Jan. 26, 2015); *see also United States v. Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) (similar). The parties' Stipulation to allow Company A and any of its representatives to appear and testify pseudonymously while Knoot himself knows who they are and who they represent already recognizes Company A's need

for privacy while protecting Knoot's capacity to prepare his defense *and* his opportunity to vigorously cross-examine any of Company A's witnesses. *See generally* Dkt. 82-1.

But the Stipulation's requirement that the jury receive a copy of the "key" that personally identifies each of Company A's representatives and Company A itself undoes much of its protections. Each juror will receive the very identity information scrupulously kept out of live testimony, and each juror will be free to disclose that information *after* trial even if he or she is required to maintain confidentiality while the trial is in progress. Moreover, Knoot's willingness to forego any testimony about Company A's public identity is essentially an admission that questions in that vein are irrelevant to his defense. Having agreed not to elicit testimony about the identities of Company A or any of its representatives because doing so would serve no purpose, it would likewise serve no purpose to disclose that information to the jury anyway on a piece of paper. But such a disclosure *would* threaten Company A and its representatives to the very harms that testifying pseudonymously was meant to prevent in the first place. *See supra* 6-9. Jurors will be entrusted with the very details the Stipulation otherwise shields—details that, once known, cannot be unseen or unheard. Providing the jury with a paper "key" containing Company A's real name and the identities of its representatives is ultimately no different from disclosing that information aloud in open court. The resulting risk to Company A and its representatives is the same, while any probative value to Knoot or the jury is nonexistent.

The Court can also protect Knoot from any juror bias during jury selection. Courts have developed approaches to maintain witness anonymity while ensuring in advance that jurors will not be personally familiar with anonymous witnesses. *See, e.g., United States v. Daskal*, No. 21-CR-110 (NGG) (LB), 2023 WL 9424080, at *5 (E.D.N.Y. July 12, 2023); *United States v. Troup*, No. 3:12-CR-36 JD, 2012 WL 3818242, at *3 (N.D. Ind. Aug. 31, 2012); *United States v. Marcus*,

2007 WL 330388, at *2 (E.D.N.Y. Jan. 31, 2007). In *Troup*, the court disclosed all real names and pseudonyms during jury selection and recused any juror who recognized any of the names. 2012 WL 3818242, at *3. But the court never provided any cross-references to link pseudonyms to the witnesses' real names. *Id.* The court in *Daskal* followed a similar approach. 2023 WL 9424080, at *5. In *Marcus*, by contrast, the witnesses planned to testify using their first names only, so the court instead presented potential jurors with pictures of each witness and recused anyone who recognized any of them. 2007 WL 330388, at *2, *4.

The approach used in *Troup* and *Daskal* would not protect Company A or its representatives in light of the parties' stipulation to use first names and last initials, Dkt. 82-1, ¶ 2, since providing a list of full names alongside pseudonyms that merely omit last names would allow jurors to easily match real names to pseudonyms. Company A therefore respectfully requests the Court follow *Marcus* by presenting each potential juror with images of all of the witnesses who might testify at trial. Then after the jury has been selected, those witnesses could testify using the agreed-upon monikers without any risk of juror bias and while also maintaining privacy for Company A and its witnesses. That would prevent any possibility of a mistrial if a potential juror realizes only during trial that he or she knows one of Company A's representatives.

Accordingly, Company A respectfully requests an order modifying the trial procedure to allow distribution of a key solely to the Court and to Knoot and his counsel, and to conduct jury selection using photographs of anticipated witnesses. That procedure would fully protect Knoot's rights to a fair trial and would also protect Company A's privacy, all in keeping with the CVRA (and RFJ). On the other hand, unnecessarily outing a cooperating victim company would not only endanger Company A but would also send a counterproductive message to other companies: that reporting foreign cyber infiltration may bring scrutiny, retaliation, and public exposure rather than

protection and deterrence. That chilling effect could undermine future corporate cooperation into cyber operations and potentially weaken U.S. national security.

**III.    TRIAL EXHIBITS AND OTHER JURY-FACING MATERIALS SHOULD LIKEWISE BE REDACTED TO PROTECT COMPANY A AND ITS REPRESENTATIVES.**

For the same reasons, any exhibits, demonstratives, or other documents presented to the jury should be redacted so that Company A and its witnesses cannot be identified. As with testimony, courts presume that their records will be public. *E.g., Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). But that presumption can be overcome by establishing a victim's sufficient "right and need to protect their personal identifying information" from public disclosure. *Taylor v. Blond*, No. 2:23-cv-01717-JCC, 2024 WL 3201381, at *2 (W.D. Wash. June 27, 2024) (citing cases and CVRA; ordering information identifying victims to be sealed or redacted). Accordingly, "[i]nformation about crime victims is regularly sealed consistent with Section 3771's requirement that victims be 'treated with fairness and with respect for the victim's dignity and privacy," which includes "protect[ing] the identity of the victims." *Bibikov*, 2023 WL 6128190, at *2 (quoting 18 U.S.C. § 3771(a)(8)).

That practice is borne out by case law. *See, e.g.*, *Bibikov*, 2023 WL 6128190, at *2 (redacting information regarding victim companies' methods for detecting counterfeit goods); *United States v. Porterfield*, No. 20-CR-42-A, 2022 WL 16918163, at *2 (W.D.N.Y. Nov. 14, 2022) (ordering United States to "redact any reference to" a victim's name and personally identifying information "in its trial exhibits" in addition to proposing "a suitable approach to identifying the victim … to the venire without disclosing [her] identit[y]"); *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 5967913, at *1 (S.D.N.Y. Dec. 15, 2021) (noting that court had granted motion in limine "to permit alleged victims to testify under pseudonyms and, as a consequence, to redact their real identities from exhibits") (citing 18 U.S.C. § 3771(a)(8)).

The same result should obtain here. It would serve no purpose for Company A's identity to remain unspoken in the courtroom if its name, logo, address, or other identifying information remains plastered on documents submitted for the jury's consideration. Similarly, it makes no sense to scrupulously avoid using a witness's full name in the jury's presence only to question them about emails or other documents that would expose that same information. *See Bibikov*, 2023 WL 6128190, at *2; *Porterfield*, 2022 WL 16918163, at *2. Company A therefore requests an order requiring any exhibits presented at trial to redact the names and other information from Company A's documents that would allow any observers to discover Company A's identity or those of its representatives.

## CONCLUSION

For the foregoing reasons, Company A respectfully requests that the Court grant this Motion and enter an order allowing Company A and its witnesses to testify pseudonymously without providing any key to the jury and requiring all exhibits and other documents or materials presented to the jury to redact names and other personally identifying information that would allow the jurors or trial observers to identify Company A or its witnesses.

Date: August 15, 2025

Respectfully submitted,

*/s/ Edward J. Canter*
J. Alex Little (TN BPR #29858)
Zachary C. Lawson (TN BPR #36092)
Edward J. Canter (NY #5345236)
Litson PLLC
54 Music Square E, Suite 300
Nashville, Tennessee 37203
Tel: (615) 985-8205
alex@litson.co
zack@litson.co
ted@litson.co

*Attorneys for Company A*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on August 15, 2025 using the Court's CM/ECF system, which served the document on all parties to the case.

*/s/ Edward J. Canter*
Edward J. Canter

*Counsel for Company A*

## CERTIFICATE OF CONFERENCE

Counsel for Company A conferred with counsel for both the United States and defendant Matthew Isaac Knoot on August 14 and 15, 2025. The United States takes no position on the relief requested in this motion, while defendant Knoot is opposed.

*/s/ Edward J. Canter*
Edward J. Canter

*Counsel for Company A*